Filed 8/11/26  In re B.S. CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re B.S., a Person Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY, | G066662 |
| Plaintiff and Respondent, | (Super. Ct. No. 18DP0929A) |
| v. | O P I N I O N |
| S.S., | |
| Defendant and Appellant. | |

Appeal from an order of the Superior Court of Orange County, Daphne Grace Sykes, Judge. Affirmed.

Jacob I. Olson, under appointment by the Court of Appeal, for Defendant and Appellant.

Leon J. Page, County Counsel, Debbie Torrez and Chloe R. Maksoudian, Deputy County Counsel, for Plaintiff and Respondent.

No appearance for the Minor.

In this child welfare proceeding, S.S. (Mother) raises two issues with respect to the juvenile court's decision to terminate her parental rights over her eight-year-old daughter, B.S. (See Welf. & Inst. Code, § 366.26.)[1] Although Mother does not challenge the termination order directly, she contends the order must be reversed because the court (1) erroneously denied her petition for modification; and (2) failed to ensure respondent, Orange County Social Services Agency (the Agency), complied with its duties under the Indian Child Welfare Act of 1978 (ICWA; 25 U.S.C. § 1901 et seq.) and the California Indian Child Welfare Act. (§ 224 et seq.) We affirm.[2]

FACTUAL AND PROCEDURAL BACKGROUND

I.

MOTHER'S PRIOR APPEAL

This is the second opinion we have written in this case. The first, which we incorporate by reference, covered the 18-month period from the time B.S. was detained in the fall of 2023 until the juvenile court terminated Mother's reunification services and set a permanent placement hearing for B.S. in the spring of 2025. (See *S.S. v. Superior Court of Orange County* (June 18, 2025, G065284) [nonpub. opn.].)

During that period, B.S. was removed from Mother's care and placed in a private foster home because Mother's mental health issues and drug use posed a substantial danger to B.S.'s physical and emotional well-being. As part of the case plan, Mother started individual counseling, but her

---

[1] All undesignated statutory references are to the Welfare and Institutions Code.

[2] B.S.'s alleged father is in prison and has waived his right to participate in the proceedings. He is not a party to this appeal.

2

behavior remained erratic, and B.S. was afraid and reluctant to visit her. Although some visitation did occur—mostly through monitored video calls— progress toward reunification was modest, and in March 2025, the juvenile court entered an order setting a hearing to determine a permanent placement plan for B.S., then age six. Mother challenged that order by way of writ, claiming she should have been provided additional visitation. We denied her petition, concluding Mother received reasonable reunification services. (*S.S. v. Superior Court of Orange County, supra*, G065284.)

## II.

### MOTHER'S CURRENT APPEAL

*A. The Post-Reunification Period: March 2025 to March 2026*

Following Mother's unsuccessful writ petition, the Agency reported B.S. was thriving in the care of her foster family and her foster mother wanted to adopt her. B.S.'s visitation with Mother, which was still occurring primarily through monitored video calls, was also going well for the most part. In fact, there were times when B.S. expressed her love for Mother and stated she did not want the visits to end. But on other occasions, B.S. was reluctant to visit Mother or hid off camera because Mother peppered her with questions and raised inappropriate topics, such as when B.S. would be coming home.

Although Mother's reunification services had been terminated, she continued to receive services through various providers. However, in a July 2025 report, the social worker reported Mother was not managing her mental health, as evidenced by the fact she was continuing to have hallucinations and delusions. Mother had also moved into residential care housing due to her inability to live independently, and she had tested positive for methamphetamine in April 2025.

3

Over the next several months, the permanent placement hearing was continued numerous times and the juvenile court ordered a bonding study to be conducted. During that period, Mother was terminated from her individual counseling for failing to develop appropriate coping skills and increase her ability to care for B.S. Her outgoing counselor reported that although Mother has consistently expressed her desire to reunify with B.S., she still faces significant challenges due to her serious chronic mental health issues.

In speaking with the social worker, Mother attributed her mental health problems to B.S. being removed from her care. Mother also made paranoid statements about B.S. being brainwashed and refused to accept a recent diagnosis revealing B.S. has attention deficit hyperactivity disorder. Visitation remained generally positive, but Mother still made inappropriate comments and promises to B.S. at times, and she displayed little insight into her own problems. B.S. reported she would feel sad if she had to live with Mother and expressed a strong a desire to live with her foster mother, who she referred to as "mom."

On November 25, 2025, Mother filed a petition for modification pursuant to section 388. Alleging changed circumstances, Mother asked the juvenile court to either return B.S. to her custody or provide her additional reunification services. In her supporting declaration, Mother stated she had been approved to move into her own apartment, was testing negative for drugs, and had just finished a group therapy program. She also alleged she had restarted individual therapy and was taking medication prescribed by her psychiatrist. In addition, Mother claimed her mental health had stabilized, she was receiving support from her extended family, and she was in a better place, emotionally and mentally, than in the past.

Mother also provided documentation that, within the previous nine months, she had completed a parenting class, as well as anger management and life skills courses that were part of a diversion program in a criminal case that had been pending against her.[3] Mother claimed that, in light of these achievements and her strong bond with B.S., it would be in B.S.'s best interests to return her to Mother's care.

However, in January 2026, just five weeks after she filed her modification petition, Mother reported to the social worker that she was feeling stressed and agitated because her psychiatrist kept changing her medications, leading Mother to suspect he might be trying to poison her. Mother also reported she had not yet moved into her apartment, and her extended family was questioning her ability to take care of herself. The social worker urged Mother to see her therapist, but Mother was reluctant to do so for fear he might advise her to go to the hospital.

The results of the bonding study were not promising for Mother either. As reflected in the social worker's report of January 14, 2026, the study found no clear evidence that B.S. was emotionally attached to Mother or was benefiting from their relationship. To the contrary, the study found Mother's mental health issues were having a negative effect on B.S.'s attitude and B.S.'s ability to accurately understand and interpret events.

In addition, the study found Mother "'is still not able to separate out her own negative reactions versus weighing objective information she is

---

[3] The criminal case stemmed from a 2023 incident at B.S.'s school during which Mother assaulted and threatened the principal and then later resisted police efforts to take her into custody. That incident was the impetus for B.S.'s detention in the current proceedings. (See *S.S. v. Superior Court of Orange County, supra*, G065284.)

provided as to [B.S.] that is essential for parental decision-making. She projects her own fear and loneliness on to [B.S. and she] misinterprets [B.S.'s] reactions to her.'" Even with an additional six to twelve months of reunification services, Mother was not expected to achieve a level of functioning where reunification with B.S. would likely be feasible.

In January 2026, Mother was also hospitalized twice due to recurring mental health problems. During the second time, on January 26, Mother called the social worker and reported she had been "shot with an insect," something in the water was making her ill, and she was being harmed by "'Persian gangsters.'" The following month, Mother failed to attend four of her scheduled visits with B.S. and falsely reported to the police that B.S. was being sexually abused. Mother also missed one of her drug tests around this time.

B.S.'s permanent placement hearing took place on March 5, 2026. Mother was given personal notice of the hearing but did not attend. Regarding Mother's petition for modification, the juvenile court determined that, at best, Mother had presented evidence of *changing*, not *changed*, circumstances. Moreover, given Mother's "significant mental illness issues," a modification to the case plan would not be in B.S.'s best interests. Therefore, the court summarily denied Mother's petition for failure to state a prima facie case for relief.

The juvenile court then turned to the issue of B.S.'s permanent placement. After finding the parental-benefit exception to termination did not apply (see § 366.26, subd. (c)(1)(B)(i)), the court terminated Mother's and the alleged father's parental rights over B.S., freeing her for adoption. In so doing, the court also found ICWA did not apply.

6

DISCUSSION

Mother contends the juvenile court's order terminating her parental rights must be reversed because the court erroneously denied her petition for modification and failed to ensure the Agency complied with its ICWA duties. We find no basis to disturb the court's order.

I.

THE MODIFICATION PETITION

Mother argues the juvenile court abused its discretion in denying her petition for modification without an evidentiary hearing. We disagree.

A parent petitioning to modify a previous child welfare order must show there has been a material change of circumstances and the proposed modification promotes the best interests of the children involved. (§ 388, subd. (a); *In re J.M.* (2020) 50 Cal.App.5th 833, 845.) To justify an evidentiary hearing on the petition, a parent need not demonstrate a probability of success on the merits. (*In re Aljamie D.* (2000) 84 Cal.App.4th 424, 432.) However, the parent must at least make out a prima facie case for relief. (*Ibid.*) More than general conclusory allegations are required. (*In re Edward H.* (1996) 43 Cal.App.4th 584, 593.)

"In determining whether the petition makes the necessary showing, the court may consider the entire factual and procedural history of the case." (*In re Jackson W.* (2010) 184 Cal.App.4th 247, 258.) "If the liberally construed allegations of the petition do not show changed circumstances such that the child's best interests will be promoted by the proposed change of order, the dependency court need not order a hearing." (*In re Anthony W.* (2001) 87 Cal.App.4th 246, 250; Cal. Rules of Court, rule 5.570(d)(1).) This is a discretionary decision to which we afford considerable deference on appeal. (*In re K.L.* (2016) 248 Cal.App.4th 52, 62.)

7

No abuse of discretion appears here. As the Agency concedes, Mother has made efforts to better herself by seeking treatment and completing various skill-building classes. We applaud those efforts. But despite Mother's claim that her mental health has stabilized, the record shows otherwise. After she filed her petition for modification alleging she was able to care for B.S., Mother showed signs of delusional and paranoid thinking, falsely reported B.S. was being sexually abused, and expressed distrust of her mental health providers. Mother was also hospitalized on two occasions due to mental health issues, underscoring concerns about her ability to cope on her own, let alone provide a safe and nurturing home for B.S. Rather than showing a stabilization of Mother's mental health problems, these circumstances only confirmed the bonding study's finding that, even with additional reunification services, it is unlikely Mother would reach a degree of parental functioning that would make reunification with B.S. feasible.

The bonding study also revealed Mother's mental health problems have had a negative effect on B.S.'s own mental health. There is nothing to suggest it would be in B.S.'s best interests to live with Mother, as opposed to her current foster home, where B.S. has consistently expressed a preference to live. Although a child's living preferences are not determinative of their best interests, they are "powerful demonstrative evidence" of such. (*In re Aljamie D., supra*, 84 Cal.App.4th at p. 432; *In re Michael D.* (1996) 51 Cal.App.4th 1074, 1087.)

For all these reasons, the juvenile court did not abuse its discretion by summarily denying Mother's modification petition without an evidentiary hearing.

## II.

## ICWA

By finding ICWA did not apply in this case, the juvenile court impliedly determined the Agency complied with its duties under the act. (§ 224.2, subd. (i)(2); *In re Austin J.* (2020) 47 Cal.App.5th 870, 885, disapproved on other grounds in *In re Dezi C.* (2024) 16 Cal.5th 1112, 1152, fn. 18.) Although Mother disputes that determination, we find no error in the court's ICWA ruling.

ICWA was enacted to "'formalize[ ] federal policy relating to the placement of Indian children outside the family home.' [Citation.] Under ICWA's state analogue statutes, [the California Indian Child Welfare Act], courts and child welfare agencies are charged with 'an affirmative and continuing duty to inquire whether a child . . . is or may be an Indian child' in dependency cases. (Welf. & Inst. Code, § 224.2, subd. (a).) Child welfare agencies discharge this state law duty by 'asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child and where the child, the parents, or Indian custodian is domiciled.' (Welf. & Inst. Code, § 224.2 subd. (b).)" (*In re Dezi C., supra,* 16 Cal.5th at pp. 1124–1125, fn. omitted.)

"A juvenile court's finding that a social service agency conducted an adequate initial inquiry into whether a dependent child is an 'Indian child' within the meaning of ICWA is affirmed if it is supported by substantial evidence, 'even if the agency did not inquire of everyone who has an interest in the child.' [Citation.] We review the juvenile court's finding regarding the adequacy of the inquiry and ICWA's applicability with deference. [Citation.] The juvenile court's fact-specific determination is a quintessentially

9

discretionary function. [Citation.] On a well-developed record, the court has relatively broad discretion to determine whether the agency's inquiry was proper, adequate, and duly diligent." (*In re K.L.* (2026) 120 Cal.App.5th 989, 995.)

Mother does not dispute that the Agency made an adequate ICWA inquiry into the available relatives on her side of the family. Indeed, the record shows that, throughout the proceedings, the Agency made repeated inquiries of Mother, the maternal aunt, and the maternal grandmother, all of whom denied having any Indian ancestry. Nevertheless, Mother contends the Agency's ICWA inquiry was insufficient with respect to B.S.'s alleged father and B.S.'s foster mother.

As noted above, B.S.'s alleged father is in prison. (See *supra*, p. 2, fn. 2.) When the social worker met with him there, he waived his right to participate in the proceedings. And when the Agency subsequently mailed him a certified ICWA letter inquiring of possible Indian ancestry in his family, he did not respond. Mother contends the Agency should have made further inquiry of the alleged father into this issue, but he never attempted to elevate his parental status above that of an alleged father. Because a child cannot claim Indian ancestry through an alleged father (*In re E.G.* (2009) 170 Cal.App.4th 1530, 1533), the Agency was not required to make additional ICWA inquiry of B.S.'s alleged father. (*Ibid.* [until an alleged father's biological paternity is established, "neither the court nor the social worker knows or has reason to know that an Indian child is involved"]; see also *In re Daniel M.* (2003) 110 Cal.App.4th 703, 707–709 [alleged father lacked standing to raise ICWA issue on appeal].)

As for B.S.'s foster mother, nothing in the record suggests she had any information regarding any possible tribal affiliation of B.S. Although

10

the foster mother certainly has an interest in the proceedings as a prospective adoptive parent, that interest would not give her access to information bearing on whether B.S. is an Indian child. Therefore, even though the Agency did not ask the foster mother about that issue, the juvenile court was within its discretion to find ICWA was satisfied in this case. (Cf. *In re Ezequiel G.* (2022) 81 Cal.App.5th 984, 1005–1006 [although extended relatives generally must be contacted to determine possible Indian ancestry of a dependent child, that is not the case when the circumstances cast doubt on the usefulness of doing so], disapproved on other grounds in *In re Dezi C., supra,* 16 Cal.5th at p. 1152, fn. 18.)

In sum, the record shows that, despite Mother's best efforts to reunify with B.S., the juvenile court properly denied Mother's modification petition and found ICWA was satisfied. No cause for reversal has been shown.

DISPOSITION

The juvenile court's order terminating Mother's parental rights is affirmed.

GOODING, J.

WE CONCUR:


MOTOIKE, P. J.


MOORE, J.

11